(November 30, 2004)

■ GEORGIA MARSH, Appellant, v JAMES SMYTH, M.D., et al., Respondents. [785 NYS2d 440]—

Order, Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered December 10, 2002, which denied plaintiff's motion to charge the jurors on the doctrine of res ipsa loquitur, and order, same court and Justice, entered December 27, 2002, which granted defendants' motion to preclude the testimony of plaintiff's experts and thereupon dismissed the complaint, reversed, on the law, without costs, the denial of plaintiff's motion vacated, defendants' motion denied, the complaint reinstated, and the matter remanded for trial.

In December 1995, plaintiff underwent a hysterectomy to treat her ovarian cancer, following which she complained of severe pain and weakness in the right arm and shoulder, which was thereafter diagnosed as long thoracic nerve palsy. Plaintiff commenced this medical malpractice action alleging that the subject palsy was caused by the anesthesia team's improper hyperabduction of her arm for an extended period while she was under general anesthesia.

Supreme Court erred in granting defendants' pretrial motion to preclude the testimony of plaintiff's two medical experts, on the ground that their theories concerning the positioning of the arm during the surgery were not generally accepted in the medical field (*see Frye v United States*, 293 F 1013 [DC Cir 1923]; *People v Wernick*, 89 NY2d 111, 115-116 [1996]). Supreme Court

went beyond the limited role of a *Frye* hearing, which is to determine whether the experts' deductions are based on principles that are sufficiently established to have gained general acceptance as reliable (*see People v Wesley*, 83 NY2d 417, 422-423 [1994]), and intruded upon the jury's realm of weighing the evidence (*see id.* at 426). The experts' testimony, and the supporting medical literature, satisfied the *Frye* standard, and a jury should be permitted to hear the testimony and consider the doctrine of res ipsa loquitur (*see States v Lourdes Hosp.*, 100 NY2d 208 [2003] [jury should hear expert testimony to assess res ipsa loquitur claim concerning the allegedly negligent hyperabduction of plaintiff's right arm during removal of ovarian cyst]). Concur—Buckley, P.J., Mazzarelli, Ellerin and Marlow, JJ.

Saxe, J., concurs in a separate memorandum as follows: This appeal concerns the proper use of the pretrial *Frye* procedure when challenged expert testimony concerns a theory of causation to be offered in a medical malpractice case. I agree with the majority that the motion court erred in precluding the testimony of plaintiff's two experts. However, I believe that the motion court's misapprehension of its proper function in such a *Frye* hearing may have resulted in part from its application of the *Frye* test in a situation in which the standard language defining the *Frye* test fits awkwardly at best. Furthermore, the initial question of whether to employ the *Frye* test here, as well as what standard to use for it, should have been more closely examined. The law does not support subjecting experts' views to pretrial hearings in every situation to ensure that they are based on sufficiently established principles; such a hearing should be held only if the basis for the expert's conclusions is novel. I believe that discussion of these points is important to assist trial judges who are confronted with ever-increasing numbers of defense challenges to testimony by plaintiffs' medical experts.

## FACTS

On December 11, 1995, a hysterectomy was performed on plaintiff Georgia Marsh at defendant New York Downtown Hospital for the purpose of treating her ovarian cancer. The surgery began at approximately 1:15 P.M. and concluded between 6:45 and 6:55 P.M. The surgery was performed, as is typical for this type of surgery, with the patient in the Trendelenburg position, with her upper body and head lower than her lower torso. Her right arm was abducted out onto a padded armboard, with an intravenous anesthesia line running into her hand.

Plaintiff emerged from the surgery with severe pain and weakness of the right arm and shoulder, which condition persisted. Several orthopedists and neurologists diagnosed the injury as long thoracic nerve palsy and expressed the view that her condition is due to a stretch injury or a compression of the nerve caused by the position of her arm during surgery. She then commenced this medical malpractice action. She asserts that the anesthesia team, consisting of anesthesiologist Dr. James Smyth and nurse anesthetist Douglas Chisolm, must have proximately caused the injury by improperly positioning her arm in a hyperabducted state for an extended period while she was under general anesthesia.

In preparation for trial, plaintiff served her CPLR 3101 (d) expert disclosure, identifying Dr. Eric Munoz and Dr. Michael Weintraub as the medical experts who would testify on her behalf at trial. Defendant Smyth then moved to preclude the testimony of Drs. Munoz and Weintraub on the ground that their theories were not generally accepted in the medical field or, alternatively, for a *Frye* hearing (*see Frye v United States*, 293 F 1013 [DC Cir 1923]) to determine whether these witnesses' planned testimony was based upon a scientific principle or procedure which is sufficiently established to have gained general acceptance in the particular field in which it belongs. New York Downtown Hospital joined in the motion. Plaintiff then moved for an order allowing the case to proceed to trial on the doctrine of res ipsa loquitur, since she had sustained a neurological injury to her right arm and shoulder while under general anesthesia.

The motion court determined that a *Frye* hearing was necessary. At the conclusion of the hearing, the court precluded plaintiff from calling Drs. Munoz and Weintraub as expert witnesses, reasoning that the bulk of the evidence showed that plaintiff's theory of causation is not generally accepted in the medical community. And, further finding the application of the doctrine of res ipsa loquitur unwarranted based upon the submitted literature, the court dismissed the complaint.

In particular, the IAS court expressed the view that "none of the [medical] literature referred to by either Dr. Weintraub or Dr. Munoz uses the term hyperabduction but instead . . . uses terms such as recumbency, recumbency on an operating table, excessive arm abduction and positioning." Relying on the assertion of one of defendants' experts that hyperabduction is not the same as excessive abduction, the court reasoned that the absence of the term hyperabduction in the articles completely invalidated plaintiff's experts' reliance on them. Further, while

the court recognized that one of the articles relied upon by plaintiff actually mentions hyperabduction during surgery as causing injury to the long thoracic nerve, it went on to ignore that 1947 article. Apparently, the court's disregard of that and other submitted articles was because it accepted defendants' contention that most of the medical literature presented by the plaintiff was irrelevant in that it concerned the brachial plexus, which, the court concluded based upon defendants' submissions and contrary to plaintiff's experts, was distinct and separate from the long thoracic nerve. In other words, finding a disagreement as to whether the long thoracic nerve ought to be considered part of the brachial plexus, the motion court implicitly found that the distinction made by defendants' experts between the two was correct, rendering irrelevant most of the articles relied upon by plaintiff. The court also rejected the applicability of certain of the articles because they considered circumstances where the position of the patient's arm and torso did not exactly mirror that of plaintiff here, and of others which reported on examinations performed on corpses.

## DISCUSSION

In precluding the testimony of plaintiff's experts, the motion court went far beyond its limited task in a *Frye* hearing, to the extent those principles apply in these circumstances.

The important purpose of the *Frye* test is to ensure that courts do not rely upon an expert's testimony regarding a novel procedure, methodology or theory unless it has been "generally accepted" within the relevant scientific community as leading to reliable results (*see People v Angelo*, 88 NY2d 217, 223 [1996]). The focus of the *Frye* test is to distinguish between scientific principles which are "demonstrable" and those which are "experimental" (*see People v Wesley*, 83 NY2d 417, 422 [1994], quoting *Frye*, 293 F at 1014). The *Wesley* court went on to emphasize that "the particular procedure need not be 'unanimously indorsed' by the scientific community but must be 'generally acceptable as reliable' " (83 NY2d at 423, quoting *People v Middleton*, 54 NY2d 42, 49 [1981]).

The *Frye* test, used in a classic context, considers whether the court should allow testimony involving a recently introduced process such as DNA testing (*see People v Wesley, supra*), polygraph tests (*see People v Angelo*, 88 NY2d 217 [1996], *supra*), or posthypnotic recollection (*see People v Hughes*, 59 NY2d 523 [1983]), by asking whether the reliability of the test or process is "generally accepted" by those in a position to know. The test has also been applied equally well where scientists and social

scientists have proposed the application of newly posited theories, such as rape trauma syndrome (*see People v Taylor*, 75 NY2d 277 [1990]), neonaticide syndrome (*see People v Wernick*, 89 NY2d 111 [1996]), or multiple chemical sensitivity syndrome (*see Oppenheim v United Charities*, 266 AD2d 116 [1999]).

In these contexts, in order to find evidence of the newly minted process or newly posited theory admissible, use of the *Frye* test to determine "general acceptance" helps courts avoid reliance on psychological theories or experimental processes which may actually be widely rejected as baseless, unreliable or insufficiently established.

Deciding the question of whether the reliability of something has been generally accepted may be established by "court opinions, texts, laboratory standards or scholarly articles" (*Wesley*, 83 NY2d at 437 [Kaye, Ch. J., concurring]), but it often involves considering whether a sufficient quantum of other experts in the same field accept the reliability of the theory or process. Indeed, as Chief Judge Kaye explained, the *Frye* test "is not for our Court to determine whether the method was or was not reliable . . . but whether there was consensus in the scientific community as to its reliability. The *Frye* test emphasizes 'counting scientists' votes, rather than on verifying the soundness of a scientific conclusion' " (*Wesley*, 83 NY2d at 439 [Kaye, Ch. J., concurring], quoting *Jones v United States*, 548 A2d 35, 42 [DC Ct App 1988]). Since the implication of this approach is that it entails a process of weighing the views of each side's experts, it is not surprising that a trial court would be tempted to weigh the relative merits of the experts introduced by each side to decide whether the proposed expert testimony is reliable. However, even where the court's task is weighing, or counting, the scientists' votes, nevertheless, it is *not* the court's job to decide, as the court did here, which expert's conclusions are correct.

But, more importantly, in a case such as this, where the proposed expert testimony concerns a claim that the plaintiff's injury was caused by the actions taken by the defendants, the whole concept of the *Frye* analysis is of limited applicability. Plaintiff's experts were not relying on a newly minted procedure or test, or a newly posited behavioral syndrome; they were simply offering their informed opinion that the way in which defendants handled plaintiff's body while she was unconscious resulted in injury to that part of her body. Expert testimony as to whether the asserted conduct of the defendants was the causative agent for the plaintiff's injury does not really involve anything novel or experimental as contemplated by the *Frye*

test. Rather, it is exactly that which is often the primary point of contention in a personal injury action, where the plaintiff offers an opinion that the defendant's conduct caused the injury, and the defendant denies any such conduct and counters that the injury resulted from some other causative agent, unrelated to defendant. Such expert testimony simply does not warrant a preliminary *Frye*-type hearing; these types of competing claims are adequately dealt with at trial. Indeed, it is arguable that to hold a pretrial hearing in this type of context is simply to give the defense an extra opportunity to cross-examine the plaintiff's experts and to pinpoint perceived weaknesses (*see* Fitzgerald, Outside Counsel, *'Frye' Motions in Birth Injury Cases*, NYLJ, Oct. 1, 2003, at 4, col 4).

Even assuming the plaintiff's expert may arguably be propounding a novel theory regarding the mechanism of the injury,* rendering the use of the *Frye* test somewhat applicable, the test must be adapted to the situation. Unlike a newly developed test or process, a theory about the mechanism of an injury will not prompt the profession generally to weigh in with its own studies or publications on the subject.

Therefore, in circumstances such as these, the question of whether the challenged testimony is admissible should not involve weighing the number of experts that concur in the expert's opinion against the number that do not, or independently deciding on the soundness of the competing experts' views. Rather, the challenge should only be successful where the challenged theory of causation finds no objective support, but instead is based solely upon the expert's own unsupported beliefs. Accordingly, the court's concern must be limited to making sure that within the scientific field in question, there is a substantive, demonstrable, objective basis for the expert's conclusion. The appropriate question for the court at such a hearing is the somewhat limited question of whether the proffered expert opinion properly relates existing data, studies or literature to the plaintiff's situation, or whether, instead, it is "connected to existing data only by the *ipse dixit* of the expert" (*see General Elec. Co. v Joiner*, 522 US 136, 146 [1997]).

The focus of the inquiry in such an instance should not be upon how widespread the theory's acceptance is, but should instead consider whether a reasonable quantum of legitimate support exists in the literature for the expert's views. Nor is it necessary, as the motion court seems to have believed, that the underlying support for the theory of causation consist of cases

---

* This phrase is adopted from Fitzgerald, Outside Counsel, *'Frye' Motions in Birth Injury Cases* (NYLJ, Oct. 1, 2003, at 4, col 4).

or studies considering circumstances exactly parallel to those under consideration in the litigation. It is sufficient if a synthesis of various studies or cases reasonably permits the conclusion reached by the plaintiff's expert.

It is important to note that in many of this Court's recent cases employing the *Frye* procedure to preliminarily rule on the admissibility of proposed expert testimony regarding causation, preclusion rulings have been based upon a complete *absence* of literature or studies supporting the claim. For example, in *Selig v Pfizer, Inc.* (290 AD2d 319 [2002], *lv denied* 98 NY2d 603 [2002]), the plaintiff's expert asserted the existence of a causal link between the use of the drug Viagra and heart attacks in men with preexisting coronary artery disease; the Court precluded plaintiff from offering this expert testimony because he had failed to demonstrate the existence of *any* clinical data or other scientific evidence supporting this theory (*id.* at 320). Similarly, a complete absence of even "a single instance" or "a single reported case" supporting the expert's theory that the particular injury, abdominal myoclonus, was caused by an overdose of the anesthetic Tetracaine, required the dismissal of the action due to a failure to prove causation in *Stanski v Ezersky* (228 AD2d 311, 312 [1996], *lv denied* 89 NY2d 805 [1996]). And, in a medical malpractice action, a *Frye* hearing was held to consider whether the medical community generally accepted the theory of causation propounded by plaintiff's expert that a precipitous delivery can cause a slow bleed resulting in cerebral palsy in the infant (*see Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106 [2003]). This Court affirmed the preclusion of that testimony, remarking that "there are *no* reported medical cases or formal studies to support his theory" (*id.* at 106 [emphasis added]).

Furthermore, to require proof in a medical malpractice case that a propounded theory of causation is accepted by a substantial percentage of the profession, would be to impose a virtually insurmountable hurdle. As a practical matter, it is likely that any theories of causation propounded by plaintiffs' experts will be challenged by an equal or greater number of defense experts.

So, the proper inquiry for the motion court here was, at most, simply to ensure that the expert opinions of Drs. Weintraub and Munoz relating to plaintiff's situation found some support in existing data, studies or literature. Their submissions provided the requisite support for the theory of causation they proposed, and accordingly, their testimony should have been permitted.

