OPINION OF THE COURT
Eileen Bransten, J.
In motion sequence number 05, defendant St. Luke’s-Roosevelt Hospital Center moves for an order precluding plaintiff’s experts Leon Charash, M.D. and Vicki Sudhalter, Ph.D. from testifying as to causation at the trial of this matter, or alternatively seeks a Frye hearing to determine whether the doctors’ opinions as to causation are generally accepted in the medical community as reliable.
Plaintiff, C, an infant, by his mother and natural guardian, Wanda Williams, vehemently opposes the motion.
Background
In this medical malpractice action plaintiff alleges that, on September 4, 1997, defendants failed to properly treat infant C’s respiratory distress syndrome, which developed within the first minutes of life and is alleged to have resulted in avoidable hypoxia sufficient to cause brain damage. (Affirmation in support U 8.) More specifically, plaintiff asserts that defendants’ negligence caused C to suffer from “pervasive developmental disorder, mental retardation, speech impairment, receptive language impairment, fine motor skills impairment, autism, brain damage and respiratory distress.” (Id. ¶ 9; exhibit D.)
Throughout 2004 and 2005, C was evaluated by at least five doctors (ranging from a pediatric neurologist to psychologists), all of whom concluded that C suffers from either autism, mental retardation or both. (See, affirmation in support ¶¶ 19-24.) In December 2005, Dr. Ruth Nass performed a neurological examination of C on behalf of St. Luke’s. Dr Nass’ report states that C suffers from autism and mental retardation. (Id. ¶ 23.)
In early 2006, St. Luke’s moved for summary judgment dismissal of the action against it. In support of its motion St. Luke’s relied on, among other things, an unsworn letter/report prepared by Dr. Nass in which she opined that C’s mental retardation was not causally related to his labor and delivery. (Affirmation in support, exhibit E at 5.) On reply, St. Luke’s for the first time provided a sworn affidavit from Dr. Nass to the same effect. In her affidavit, which was dated March 31, 2006, Dr. Nass stated: “There is no evidence with a reasonable degree of medical certainty to support the claim that a child can have *690 mental retardation and/or autism and/or pervasive developmental disorder from a hypoxic event without having cerebral palsy as well.” (Opposition, exhibit 32,¶ 20 [emphasis added].)
In May 2006, this court denied St. Luke’s motion for summary judgment, explaining that “there are material issues of fact that warrant a trial, among them, whether St. Luke’s . . . negligently failed to recognize and treat signs of perinatal asphyxia, fetal respiratory distress and fetal lung immaturity.” (Affirmation in support, exhibit E, at 14.) In addressing the motion, the court refused to consider Dr. Nass’ unsworn materials or her affidavit, which came too late on reply. (Id. at 5.)
Plaintiff subsequently exchanged a CPLR 3101 (d) expert disclosure (generally referred to as a 3101 [d]) revealing that Dr. Sudhalter would testify at trial. Attached was a report that Dr. Sudhalter prepared in approximately late February 2006 that is titled “Autism Evaluation.” The report is based on records and materials, including submissions authored by Dr. Charash and Dr. Nass. In the autism evaluation, Dr. Sudhalter concludes:
“Clearly [C] does not suffer from autism. . . .
“He does have brain damage. The principal manifestation of this brain damage is his mental retardation. The behavioral and communicative problems that he demonstrates are a consequence of his brain damage and retardation. The etiology of [C’s] difficulties is related to oxygen deprivation in the peripartum interval.
“In summary, based on consideration of the patient’s neuropsychological deficits, his medical history and the medical literature, I conclude that brain damage from perinatal anoxia caused [C’s] neuropsychological impairments. I hold this opinion and all others in this report with a reasonable degree of psychological certainty.” (Affirmation in support, exhibit F.)
Plaintiff also exchanged a 3101 (d), stating that Dr. Char ash, a pediatric neurologist, would be called to testify at trial. The 3101 (d) sets forth, among other things:
“This expert will testify that the infant plaintiff has a normal life expectancy. He will testify that the infant plaintiff is diagnosed as having the residuae of a static encephalopathy dating back to the peripartum interval. He will further testify that the infant plaintiff will have significant problems with *691 locomotion, fine and gross motor coordination, and his capacity to learn.
“This expert will base his opinions upon physical exams, newborn and pediatric records, school and/or therapy records and the general body of knowledge of pediatrics and pediatric neurology.
“This expert will opine that the plaintiffs injuries are causally related to the negligence/departures claimed by the plaintiff herein.” (Affirmation in support, exhibit F.)
Dr. Charash has further opined that the “etiology of [C’s] cognitive and behavioral deficits is oxygen deprivation during the newborn period.” (Affirmation in support, exhibit R.)
St. Luke’s objected to the expert disclosure, urging that the 3101 (d) for Dr. Charash is “devoid of any statement in reasonable detail as to how the alleged negligence was a substantial factor in causing the infant plaintiffs alleged injuries.” As to Dr. Sudhalter, St. Luke’s objected to any testimony as to causation since “she is not a medical doctor and is not able to render an opinion as to causation.” (Affirmation in support, exhibit S.)
St. Luke’s now moves for an order precluding Dr. Charash and Dr. Sudhalter from testifying as to causation at trial. Alternatively, St. Luke’s seeks a hearing pursuant to Frye v United States (293 F 1013 [DC 1923]) to determine whether these doctors’ opinions as to causation are generally accepted in the medical community as reliable. (Order to show cause at 2.)
More specifically, St. Luke’s argues that plaintiff bears the burden of establishing that the theories his experts set forth are generally reliable within the scientific community. It contends that plaintiffs 3101 (d) for Dr. Charash is defective because it “is devoid of any statement regarding what [he] will testify to as the cause of [C’s] alleged injuries.” (Affirmation in support 1i 27.) St. Luke’s points out that both doctors Charash and Sudhalter “have failed to provide a scientific basis for the position that autism and/or pervasive developmental disorders and/or mental retardation are caused by hypoxia.” (Affirmation in support 11 31.)
In support of its motion, St. Luke’s relies on an affidavit from Dr. Nass (the doctor who examined C and whose submissions were rejected in the summary judgment context), which is dated November 8, 2006. Dr. Nass opines that:
“There is no evidence with a reasonable degree of *692 medical certainty to support the claim that a child can have mental retardation and/or autism and/or pervasive developmental disorder from a hypoxic event without having cerebral palsy as well. . . . “Medical literature in the field establishes that it is impossible to conclude that mental retardation and/or autism and/or pervasive developmental disorder in this particular child is related to a perinatal event or neonatal event without engaging in sheer speculation as there is no generally accepted cause of autism, pervasive developmental disorder and/or mental retardation in the scientific and medical community.
“I am not aware of any scientific data or medical organization or board that recognizes a causal relationship between hypoxia and autism, pervasive developmental disorder and/or mental retardation and there is no scientifically reliable epidemiological evidence to support the theory that hypoxia can lead to autism, pervasive developmental disorder and/or mental retardation.
“I have never seen autism and/or pervasive developmental disorder and/or mental retardation as a causal consequence of hypoxia in the neonatal period.
“I have not seen any clinical research or epidemiological or peer reviewed research proving a causative relationship between hypoxia and autism and/or pervasive developmental disorder and/or mental retardation.
“I have not seen any peer-reviewed literature, treatise or chapters in relevant textbooks proving a causative relationship between hypoxia and autism and/or pervasive developmental disorder and/or mental retardation. . . .
“Moreover, it is my opinion with a reasonable degree of medical certainty that [C] did not suffer from any significant hypoxia at any point during his care by St. Luke’s Medical Center and did not sustain brain damage and that his autistic disorder and/or pervasive developmental disorder and/or mental retardation are based in genetics or are congenital in nature and that defendant, St. Luke’s-Roosevelt Center, did not cause or contribute to the infant’s autism and/or pervasive developmental disorder and/or mental *693 retardation.” (Affirmation in support, exhibit R, 1Í1Í14, 18, 20-25 [emphasis added].)
Plaintiff opposes St. Luke’s motion on several grounds. Plaintiff argues that the motion is a thinly veiled attempt “to revive this failed attack on Dr. Sudhalter’s opinion made in the course of its summary judgment motion, under the present guise of a Frye motion.” (Plaintiff’s mem of law in opposition to defendant’s motion to preclude at 5.) Plaintiff points out remarkable similarities between the points made by St. Luke’s in its summary judgment reply papers and those it relies on now (including identical language used by Dr. Nass to discredit plaintiff’s case). Plaintiff argues that St. Luke’s should not get yet another chance at the pretrial stage to belatedly attack the theory of causation. (Plaintiff’s mem at 6-7.)
Plaintiff further complains that St. Luke’s maneuver improperly circumvents New York’s procedural rules in that it is an improper attempt to obtain improper expert discovery extending beyond that which is permitted by CPLR 3101 (d). (Plaintiffs mem at 17-20.)
Plaintiff also attacks St. Luke’s motion on the merits, submitting affirmations from Dr. Charash, Dr. Sudhalter, Sarah Raz, Ph.D. and Rosario R. Trifiletti, M.D.
Dr. Charash asserts that it “is generally accepted in the medical community that a hypoxic event can result in mental retardation, as well as autism or pervasive developmental disorder in the absence of comorbidity in the form of cerebral palsy or any other motor disorder.” (Opposition affirmation of Leon I. Charash, M.D. ¶ 13.) Dr. Charash points out that he has “treated many children with mental retardation caused by hypoxia who did not also have cerebral palsy.” (Id. ¶15.) Dr. Charash asserts that his opinion is “not at all novel” and refers to medical literature and studies in support of his opinion. (Id. ¶ 16.) Dr. Sudhalter provides an affidavit to the same effect. (See, opposition affidavit of Dr. Sudhalter ¶ 14.)
Similarly, Dr. Raz states that based on her knowledge of relevant literature and research experience
“it is well established that perinatal hypoxia can result in the types of behaviors exhibited by [C]. Numerous studies have shown that infants who suffer hypoxic episodes at the time [of] birth, but are not diagnosed with cerebral palsy, can and do demonstrate persistent deficits in communication, behavior *694 and cognition.” (Opposition affidavit of Dr. Raz 1111.)
Dr. Trifiletti, who is a licensed New York physician board certified in pediatrics and neurology, agrees with Dr. Charash that “it is generally accepted in the medical community that a hypoxic event can result in mental retardation, as well as autism or pervasive developmental disorder” in the absence of cerebral palsy. (Opposition affirmation of Dr. Trifiletti 1i 15.)
On reply, St. Luke’s argues that a motion to preclude based on Frye is very different from a motion for summary judgment in that the standards for granting relief in each context vary. (Reply affirmation ¶12.) St. Luke’s further argues that it could not have sought preclusion of testimony related to causation at the summary judgment stage because it had yet to receive plaintiffs expert disclosure and there was no guarantee that plaintiff would rely on Dr. Charash or Dr. Sudhalter at trial. (Id. ¶ 16.)
St. Luke’s sets forth that it does not want a deposition of plaintiffs experts at all; rather, it “seeks evidence to support plaintiffs experts’ theory of causation.” (Id. ¶ 17 [emphasis added].) St. Luke’s also makes clear that it is
“asking that [Dr. Charash’s] testimony be precluded on the grounds that he is an incredible witness. Should the court determine that [Dr. Charash] is indeed a credible witness, [St. Luke’s] then asks that this Court conduct a Frye inquiry as to whether [Dr. Charash’s] theory of causation — hypoxic ischemic encephalopathy can cause mental retardation without cerebral palsy — is generally accepted as reliable in the relevant medical community.” (Id. ¶ 31.)
St. Luke’s also urges that all of the literature upon which plaintiffs experts rely is inapposite because in all of those studies provided, the infants had characteristics that differed materially from those C possessed. (Id. ¶ 44.)
Analysis
At the outset, it is not for this court to address Dr. Charash’s credibility. Assessment of credibility is “peculiarly within the province of the jury.” (Cholewinski v Wisnicki, 21 AD3d 791, 792 [1st Dept 2005]; see also, Sullivan v DRA Imaging, P.C., 34 AD3d 371 [1st Dept 2006].) Thus, this court will not make any credibility findings or preclude Dr. Charash from testifying simply because St. Luke’s sets forth that he is not credible.
*695 The more interesting question is whether the testimony of Dr. Char ash and Dr. Sudhalter should be precluded or a hearing held at this stage based on the applicability of Frye v United States (293 F 1013, 1014 [DC 1923]). New York courts have long applied the Frye test in analyzing whether “novel scientific evidence” is admissible. (See, People v Wesley, 83 NY2d 417, 422 [1994]; Nonnon v City of New York, 32 AD3d 91, 102 [1st Dept 2006].) The Frye test poses the “elemental question” of whether scientific evidence is considered reliable by the scientific community. (People v Wesley, 83 NY2d at 422.) As the court in Frye v United States (293 F 1013, 1014 [DC 1923]) explained:
“Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.”
Significantly, pursuant to Frye, the proffered theory need not be “unanimously indorsed” by the scientific community, but it must be “generally acceptable as reliable.” (People v Wesley, 83 NY2d at 423.) Accepted reliability can generally “be demonstrated through scientific or legal writings, judicial opinions, or expert opinion other than that of the proffered expert.” (Parker v Mobil Oil Corp., 16 AD3d 648, 651 [2d Dept 2005].)
New York courts have applied Frye and precluded expert testimony related to causation when the theory set forth was novel and not generally accepted in the medical community. (See, Lewin v County of Suffolk, 18 AD3d 621 [2d Dept 2005] [precluding expert testimony that in útero exposure to certain pesticide causes birth defects]; Hooks v Court St. Med., P.C., 15 AD3d 544, 545 [2d Dept 2005] [precluding scientifically unreliable opinion that improper placement of electrodes of an electrical muscle stimulating unit could cause permanent nerve damage]; Lara v New York City Health & Hosps. Corp., 305 AD2d 106 [1st Dept 2003] [precluding testimony that slow bleed in infant’s brain could have caused cerebral palsy]; Selig v Pfizer, Inc., 290 AD2d 319 [1st Dept 2002], lv denied 98 NY2d 603 [2002] [precluding testimony that Viagra causes small drop in blood pressure].)
*696 If the causation, theory propounded is not novel or unsubstantiated, however, a Frye hearing is unwarranted. (See, Meth v Gorfine, 34 AD3d 267, 268 [1st Dept 2006] [whether diagnostic delay would have affected patient’s prognosis is a “typical” oncological issue that did not require a Frye hearing]; Marsh v Smyth, 12 AD3d 307, 308 [1st Dept 2004] [error to preclude expert testimony related to positioning of an arm during surgery on Frye grounds]; Gayle v Port Auth. of N.Y. & N.J., 6 AD3d 183, 184 [1st Dept 2004] [factual disagreement related to causation did not warrant a Frye hearing since “during the testimony of plaintiff’s medical experts . . . there were relevant examples and data accompanying the experts’ opinions”].)
Although St. Luke’s may have a basis for challenging plaintiffs experts’ opinions at trial, and may well be entitled to a Frye hearing then, the relief will not be granted at this pretrial stage. Precluding plaintiffs experts at this point or even holding a pretrial Frye hearing would undercut the well-established prohibition on untimely summary judgment motions and improperly expand the scope of expert disclosure defined by CPLR 3101 (d). (See, generally, Robert F. Danzi and Joan M. Ferretti, Outside Counsel, ‘Frye’ Motions in New York Personal Injury Litigation, NYLJ, June 18, 2004, at 4, col 4 [discussing the “misuse of so called Frye motions to obtain litigation advantages which are not contemplated by the CPLR”].)
At the summary judgment stage, St. Luke’s had the ability to establish that C’s injuries were not caused by any alleged malpractice. St. Luke’s failed to properly offer any admissible evidence to that effect. Dr. Nass’ affidavit could not be considered because it was improperly submitted on reply when plaintiff had no opportunity to respond. Now, relying on an affidavit from Dr. Nass that contains identical language, St. Luke’s essentially seeks the exact same relief again — after losing its first motion and at a time when summary judgment dismissal can no longer be obtained. St. Luke’s has long known plaintiffs theory of causation, which was raised well in advance of any CPLR 3101 (d) exchange. This court will not give St. Luke’s a second bite at the apple and allow it to attack plaintiffs unchanged theory at this late stage.
In Taveras v St. Luke’s-Roosevelt Hosp. (6 Misc 3d 1016[A], 2005 NY Slip Op 50054[U], *4 [Sup Ct, NY County 2005]), which also involved a pretrial challenge to Dr. Charash’s expert testimony related to causation, Justice Stanley Sklar explained:
“That plaintiff may not be able to prove a prima *697 facie case because of conclusory expert testimony may be a basis for a summary judgment motion, which in this case would be too late, or a motion for a directed verdict at the end of the plaintiffs case, but it is not a basis for a Frye hearing.
“Nonetheless, if during the trial it becomes readily apparent that the basis offered by any of plaintiffs experts for that expert’s conclusion that the infant suffered perinatal brain damage is a novel one[,] defendants are free to move for a Frye hearing before that judge.” (See also, Jeffrey M. Kimmel, Outside Counsel, ‘Frye’s’ Applicability to Medical Malpractice Cases, NYLJ, June 13, 2007, at 4, col 4 [medical malpractice defendants “increasingly move for summary judgment and, if they lose, file Frye motions challenging the basis of the expert’s opinions. In essence, under the guise of Frye, defendant physicians are taking two bites at the apple”].)
Additionally, conducting a pretrial Frye hearing would permit St. Luke’s disclosure to which it is not entitled. CPLR 3101 (d) governs the scope of pretrial expert discovery. It provides that each party must disclose “in reasonable detail the subject matter on which each expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert’s opinion.” (CPLR 3101 [d] [1] [i].) “Further disclosure concerning the expected testimony of any expert may be obtained only by court order upon a showing of special circumstances” (CPLR 3101 [d] [1] [iii] [emphasis added]).
There can be no doubt that at this point plaintiff has disclosed the subject matter of Dr. Char ash and Dr. Sudhalter’s opinions, the substance of their opinions and a summary of the grounds of their opinions (including medical literature that these doctors intend to rely on at trial). That is all the information St. Luke’s is entitled to at this juncture. (See, Krygier v Airweld, Inc., 176 AD2d 700, 701 [2d Dept 1991] [“a party’s request for the facts and opinions upon which another party’s expert is expected to testify is improper. The requesting party is entitled only to the substance of those facts and opinions” (emphasis added)]; see also, Ferris v Marchese, 284 AD2d 998, 999 [4th Dept 2001] [plaintiffs need only disclose in reasonable detail “a summary” of the grounds for the opinion of their expert]; Weininger v Hagedorn & Co., 203 AD2d 208, 209 [1st Dept 1994]; Nedell v *698 St. George’s Golf & Country Club, 203 AD2d 121, 122 [1st Dept 1994].)
If this court held a Frye hearing before trial, St. Luke’s would have an opportunity to thoroughly question plaintiffs experts without showing any “special circumstances” or paying costs associated with a deposition. (Cf., Padro v Pfizer, Inc., 269 AD2d 129, 130 [1st Dept 2000] [purported novelty of expert opinion did not justify deposition of expert].) This court will not grant St. Luke’s such a windfall (particularly since it failed to properly attack the identical causation theory at the summary judgment stage). St. Luke’s has not established that the CPLR entitles it to obtain the “evidence” supporting plaintiffs causation theory that it seeks in advance of the trial.
In the end, St. Luke’s has not established a right to preclusion of plaintiffs experts or any entitlement to a pretrial Frye hearing.
Accordingly, it is ordered that St. Luke’s motion is denied without prejudice to renewal before the trial judge at the time of trial.