[939 NYS2d 434]

BRENDA CORNELL, Appellant, v 360 WEST 51ST STREET REALTY, LLC, et al., Defendants, 360 W. 51ST STREET CORP. et al., Respondents. (And a Third-Party Action.)

First Department, March 6, 2012

**APPEARANCES OF COUNSEL**

*Gallet Dreyer & Berkey, LLP*, New York City (*Morrell I. Berkowitz* and *Beatrice Lesser* of counsel), for appellant.

*Bonner Kiernan Trebach & Crociata LLP*, New York City (*Alan L. Korzen* and *Mindy L. Jayne* of counsel), for respondent.

## OPINION OF THE COURT

MANZANET-DANIELS, J.

The motion court incorrectly interpreted our ruling in *Fraser v 301-52 Townhouse Corp.* (57 AD3d 416 [2008], *appeal dismissed* 12 NY3d 847 [2009]), as setting forth a categorical rule requiring dismissal of plaintiff's toxic mold claim due to failure meet the standard of scientific reliability set forth in *Frye v United States* (293 F 1013 [DC Cir 1923]). In *Fraser*, another case involving injuries arising out of exposure to toxic mold, we affirmed dismissal of the plaintiff's personal injury claim because the plaintiff's submissions failed to raise a triable issue of fact. We never disavowed the underlying theory that exposure to mold may, under certain circumstances, give rise to respiratory and other ailments. Indeed, this Court was careful to limit its holding in *Fraser*, explicitly stating, "We stress that our holding does not set forth any general rule that dampness and mold can never be considered the cause of a disease, only that such causation has not been demonstrated by the evidence presented by plaintiffs here" (57 AD3d at 418).

The motion court erred in finding that plaintiff's proof was not "strong enough to constitute a causal relationship," or that the methodologies used to evaluate her condition failed to meet the *Frye* standard (26 Misc 3d 1211[A], 2009 NY Slip Op 52707[U], *2-3 [2009]). The focus of the *Frye* inquiry "should not be upon how widespread [a] theory's acceptance is, but should instead consider whether a reasonable quantum of legitimate support exists in the literature for [an] expert's views" (*Marsh v Smyth*, 12 AD3d 307, 312 [2004, Saxe, J., concurring]). Even the dissent does not dispute that plaintiff's theory of causation finds some support in the scientific literature[1] (*compare Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106, 106 [2003] [complete absence of any clinical data or formal studies supporting expert's theory that a precipitous delivery, without significant bleeding, could give rise to cerebral palsy arising six months after birth; trial court noted that expert "could not point to a reported case and could not point to a

---

1. The dissent's criticisms of the studies relied on by plaintiff unfairly adjudge the quality of the data, not the quantum of data. For example, the dissent derides the data in one study as "represent[ing] *initial* steps toward defining the pathophysiological mechanisms" for certain "aeroirritant effects" associated with excess mold growth. This statement in no way detracts from the study's conclusion, however, that "there remains a large population of patients who do suffer medical problems related to damp indoor home environments."

medical writing that set forth his theory even in general terms"]).[2] Since plaintiff's expert's opinions relating plaintiff's condition to the mold infestation find "some support in existing data, studies [and] literature" (*Marsh*, 12 AD3d at 313), namely, studies that have found a statistically significant relationship between mold and various respiratory maladies, the *Frye* standard is satisfied.

Plaintiff has lived in the subject apartment since 1997. The apartment is located directly above the basement area of the building. Plaintiff testified that she had occasion to walk through the public areas of the basement throughout her tenancy and described the area as damp, musty, and harboring bugs and mice. Floods in the summer of 2002 and 2003 resulted in water damage in the basement stairwell and on the walls of the basement. During the summer of 2003, a steam pipe broke in plaintiff's apartment, releasing steam. In July 2003, after the pipe broke and water leaked in the basement, plaintiff noticed a small amount of mold in her bathroom. Plaintiff testified that when she entered the bathroom she began to feel ill, experiencing a body rash, shortness of breath, fatigue, disorientation and headaches. She testified that the landlord placed a dehumidifier in the bathroom and advised her to wash the area with bleach. Plaintiff did so and her symptoms disappeared.

During the course of plaintiff's tenancy, on or about September 5, 2003, 360 West 51st Street Realty, LLC[3] purchased the building from defendants-respondents 360 W. 51st Street Corp. and Geoffrey Shotwell. On October 1, 2003, the new owner began renovations in the basement. On the day debris removal commenced, plaintiff experienced dizziness, chest tightness, congestion, shortness of breath, a rash, swollen eyes and a metallic taste in her mouth. Despite allergy medicines prescribed by her doctor, plaintiff's symptoms only subsided when she left the premises for a period of time.

On October 7, 2003, plaintiff left the apartment due to difficulty breathing. In November 2003, plaintiff informed defendant landlord that she was unable to live in the apartment due to

---

**2.** *See also* Jonathan Vatner, *Battling Mold Infestations*, New York Times, Feb. 11, 2011 (discussing fact that the Department of Housing Preservation and Development issued 14,290 violations in 2010 alone for mold in residential buildings, and noting that the building industry may soon adopt mold-resistant drywall as a standard, quoting source as stating, "This is a very low-cost proposal with substantial health benefits").

**3.** 360 West 51st Street Realty, LLC has settled with plaintiff and is not an appellant.

the ongoing renovation work and was withholding rent for the month of November. Plaintiff moved in with a friend and never again slept in the apartment.

360 West 51st Street Realty commenced a summary nonpayment proceeding against plaintiff in the Civil Court. Plaintiff answered and asserted counterclaims for, inter alia, constructive eviction and breach of the warranty of habitability. Following a 17-day trial, the Civil Court found in plaintiff's favor, awarding her a 100% abatement for the months of October 2003 through April 2004, as well as a 20% abatement in July 2003 when the pipe broke in plaintiff's apartment and plaintiff first noticed mold and experienced physical symptoms.

At the Civil Court trial, plaintiff's experts testified that the damp conditions in the basement had created the ideal environment for growth of fungus, and that the contractors disturbed years of spores and dust when they cleaned out the basement. Plaintiff's witnesses theorized that a hazardous suspension of these particles moved up a dumbwaiter shaft and through cracks in the floor, entering plaintiff's apartment and contaminating the space.

Lawrence B. Malloy, an environmental investigator and consultant concerning indoor air quality and toxic materials abatement, visited the premises on November 3, 2003 and took samples. His tests confirmed the presence of molds including aspergillus/penicillium, stachybotrys and chaetomium. Mr. Malloy noted that stachybotrys cannot exist without a continuous source of water and opined that there is no acceptable indoor level of the mold.

Dr. Chin S. Yang, a microbiologist, testified that samples collected in March 2004 from plaintiff's apartment showed contamination from aspergillus/penicillium, stachybotrys, chaetomium and paecilomyces variotii. Dr. Yang stated that stachybotrys and chaetomium are excellent indicators of water damage and opined, based on the combinations and different species of fungi found in the apartment, that the environment had sustained long-term water damage.

Jay Danilczyk, an environmental consultant, inspected and took samples in the basement, apartment and air shaft in March 2004. Danilczyk also found mold growing under the floorboards in the apartment.

The evidence showed that defendant landlord was on notice of the mold condition as early as October 1998, as demonstrated

by a "mold testing" report dated October 14, 1998 that it commissioned from an environmental consultant. The report noted, inter alia, the presence of mold in the cellar, "mold stained sheetrock walls," and a variety of fungi including aspergillus and penicillium. The testing was done specifically in response to "tenant concerns regarding mold" and discovery of mold in the apartment of a basement tenant.

Defendant ordered additional testing of the basement in July 2003 in response to further complaints by the basement tenant. The consultant stated that its primary purpose was to test the apartment for the presence of mold following a water infiltration episode. The consultant noted that aspergillus/penicillium spores were the "dominant finding" in the apartment location and recommended cleaning of the impacted area and retesting. Thus, the evidence supports the inference that a mold condition existed in the basement for years prior to defendants' sale of the building.

Defendants and plaintiff cross-moved for summary judgment. Defendants' expert, Dr. Michael Phillips, M.D., acknowledged that "[m]olds can cause a wide spectrum of illnesses, including allergies, irritation, hypersensitivity pneumonitis and direct infection." Defendants' expert opined that mold was "ubiquitous" and that mold under floorboards "generally constitute no significant exposure." Defendants' expert did not examine plaintiff in arriving at his conclusion that mold had not caused her ailments, concluding, upon a review of her medical records, that "in the case of Ms. Cornell, molds caused no significant, objectively documented illness."

Plaintiff relied on the affidavit of her treating physician, Dr. Eckhard Johanning. Dr. Johanning opined that exposure to damp buildings with excessive and atypical mold contamination was a recognized cause of respiratory health complaints and conditions such as asthma, rhino-sinutis, bronchitis, allergy, infections and irritant-type reactions of the skin and mucous membranes.

Dr. Johanning opined, with a reasonable degree of medical certainty, that plaintiff's irritative and allergic-type symptomatology was caused by exposure to building dampness and excessive and atypical mold exposure, over time, at her apartment. In arriving at his conclusion concerning plaintiff's physical health and its cause, Dr. Johanning considered plaintiff's medical and occupational history and history of environmental exposure, other competing/confounding environmental/occupational

exposures, a detailed physical examination of plaintiff, diagnostic laboratory studies, the medical and scientific literature, and details of the environmental and exposure data.

Dr. Johanning conducted a number of different blood tests/ panels that included an evaluation of the liver, kidneys and immunological system, hormones (to assess thyroid function), protein chemistry, heavy metal analysis, urinalysis, allergy specific IgE and IgG, and respiratory function tests such as spirometry, inhaler studies and diffusion tests, and other examinations. Dr. Johanning opined that plaintiff still exhibited immune mediated hypersensitivity reactions (IG antibodies) to microbes typically found in very wet and damp environments, consistent with her medical history and exposure.

Dr. Johanning stated that in arriving at a conclusion assessing the health effects of building dampness and mold exposure in plaintiff (or any other patient), he used a differential diagnosis, the universally accepted methodology used by physicians in assessing causation and diagnosing illness.

Dr. Johanning stated there was "no question" that the conditions existing in plaintiff's apartment, including dust, microbial growth, mold, heavy metals and a diversity of fungi and bacteria that had come up through the floorboards and the air shaft in the apartment as a result of demolition work in the basement, contamination from flooding, as revealed by long-term water damage, as well as dust, standing water, moisture and streaking on the walls, "had a host of deleterious effects" on plaintiff's health.

In forming his opinions, Dr. Johanning relied on a number of peer-reviewed studies, including a 2004 publication of the Institute of Medicine in the National Academies, entitled *Damp Indoor Spaces and Health,* relied upon by the *Fraser* plaintiffs, as well as two studies which postdate *Fraser,* a 2007 study entitled *Excess Dampness and Mold Growth in Homes: An Evidence-Based Review of the Aeroirritant Effect and its Potential Causes* (28 Allergy and Asthma Proceedings No. 3, May-June 2007), and an article published in 2008 entitled *Hydrophilic Fungi and Ergosterol Associated with Respiratory Illness in a Water-Damaged Building* (Environmental Health Perspectives, 116:45-50, Jan. 2008). The first study reviewed the major epidemiological and biological studies, concluding that "[t]he preponderance of epidemiological data supports a link between exposure to dampness and excess mold growth and the development of aeroirritant symptoms," and that studies

"support the role of VOCs [volatile organic compounds] in contributing to the aeroirritant symptoms of occupants of damp and mold-contaminated homes." The authors noted, in reviewing the data, that "[m]ultiple studies [ ] have found a dose-response relationship between the numbers of indicators of dampness present and aeroirritant symptoms." These studies found statistically significant relationships between visible mold growth and eye, nose and throat/respiratory symptoms.

The second study found that among workers in a building with long-term water damage, "respiratory illnesses showed significant linear exposure-response relationships to total culturable fungi." The authors stated that they had found "significant linear exposure-response relationships between various microbial measurements (total fungi, fungi requiring $Aw \geq 0.8$, hydrophilic fungi, ergosterol, and endotoxin) in dust and health outcomes (respiratory cases, epi-asthma cases, and postoccupancy asthma cases)." The authors found that the associations between health outcomes and fungi were mostly driven by exposure to fungi requiring $Aw \geq 0.8$, and specifically hydrophilic fungi in both floor and chair dust, that exposure to hydrophilic fungi in floor and chair dust was associated with about a two-fold increase in the chances of being a post-asthma occupancy case, and that of all the environmental variables, hydrophilic fungi in floor dust were most strongly associated with postoccupancy asthma cases.

The court granted defendants' cross motion for summary judgment dismissing the complaint, finding that it was constrained by this Court's decision in *Fraser v 301-52 Townhouse Corp.* (57 AD3d 416 [2008], *appeal dismissed* 12 NY3d 847 [2009], *supra*), to dismiss plaintiff's claims for personal injuries caused by exposure to mold. The court stated, with respect to the issue of general causation:

> "Higher appellate review is awaited, given that this dispute arises in the context of widespread public concern and increasing litigation about the effects of mold on health. For purposes of this opinion, however, the *Fraser* majority has resolved the issue of the sufficiency of the current epidemiological evidence to demonstrate general causation. As the majority found that the epidemiological evidence on which Dr. Johanning relied was not sufficiently strong to permit a finding of general causation, and as the limited supplemental studies that are submit-

ted in this action plainly do not remedy the insufficiency found by the *Fraser* majority, this court is constrained to hold that plaintiff is unable to prove general causation" (2009 NY Slip Op 52707[U], *6).

The court also found that *Fraser* had foreclosed plaintiff's evidence of specific causation, stating that *"Fraser* rejected Dr. Johanning's claim to have established causation by means of 'differential diagnosis' " (*id.*). The court concluded:

> "The scientific theory advanced in *Fraser* is the same theory advanced here, by the same witness, Dr. Johanning, on the basis of largely the same scientific evidence. While stressing that its holding did not 'set forth any general rule that dampness and mold can never be considered the cause of a disease,' *Fraser* found that such causation had not been demonstrated by the evidence presented by the plaintiffs there . . . *Fraser* mandates this court's dismissal of plaintiff's personal injury cause of action" (*id.* at *7).

Despite this Court's admonition in *Fraser*, that *Fraser* "does not set forth any general rule that dampness and mold can never be considered the cause of a disease" (*Fraser*, 57 AD3d at 418), the motion court nonetheless interpreted *Fraser*, erroneously in our view, as requiring rejection of plaintiff's personal injury claim based on exposure to mold. The scientific evidence shows that exposure to molds, particularly the types of molds whose presence in plaintiff's apartment was confirmed by sampling, i.e., aspergillus/penicillium, stachybotrys and chaetomium, can cause the types of ill effects experienced by plaintiff.

The evidence offered on the motion easily satisfied the test of scientific reliability set forth in *Frye*. The motion court found that the supplemental studies relied on by Dr. Johanning "plainly do not remedy the insufficiency found by the *Fraser* majority" (2009 NY Slip Op 52707[U], *6). However, a thorough reading of the studies relied on by plaintiff's expert demonstrate a clear relationship between exposure to mold and respiratory and other symptoms. One study found "significant linear exposure-response relationships between various microbial measurements (total fungi, fungi requiring $Aw \geq 0.8$, hydrophilic fungi, ergosterol, and endotoxin) in dust and health outcomes (respiratory cases, epi-asthma cases, and postoccupancy asthma cases)." Another, upon a review of the epidemiological data, concluded that *"[t]he preponderance of epidemio-*

*logical data* supports a link between exposure to dampness and excess mold growth and the development of aeroirritant symptoms'' (emphasis added).

The results in the studies relied on by plaintiff were found to be statistically significant, meaning the strength of the association was sufficient to conclude, within the range of probability, that exposure to mold caused the identified ill-health effects. Scientists do not report their results in terms of black and white causality, but rather, in terms of the strengths of the associations found. These associations having been found sufficiently strong by the literature as to be indicative of a causal relationship, plaintiff's evidence must be deemed to meet the *Frye* standard.

■ Plaintiff has also adequately established specific causation. The evidence confirmed the presence of these types of molds in plaintiff's apartment. Plaintiff's expert opined that plaintiff's exposure to these fungi, including their by-products such as allergens, mycotoxins, and microbial volatile organic compounds, caused plaintiff's ailments. Plaintiff's expert opined that plaintiff still exhibited immune mediated hypersensitivity reactions, as confirmed by IG testing, to microbes typically found in very wet and damp environments.

The motion court found that plaintiff had failed to adequately set forth her exposure levels to the molds identified in the apartment. Yet we have stated, time and time again, in cases involving environmental contamination and exposure to toxic substances, that it is generally difficult or impossible to quantify a plaintiff's exposure to a toxin.

The Court of Appeals, in *Parker v Mobil Oil Corp.* (7 NY3d 434 [2006]), made clear that ''it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community'' (*Parker*, 7 NY3d at 448; *see Wright v Willamette Indus., Inc.*, 91 F3d 1105, 1107 [8th Cir 1996] [''We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains'']).

The motion court's reasoning runs counter to that of the Court of Appeals in *Parker* and is contrary to the views expressed by our sister Departments in cases involving exposure

to toxic mold (*see e.g. Cabral v 570 W. Realty, LLC*, 73 AD3d 674 [2d Dept 2010] [denying summary judgment where, inter alia, defendant failed to meet its initial burden of establishing, through scientifically reliable methodology, that no causal link existed between the plaintiff's injuries and their exposure to mold]; *Rashid v Clinton Hill Apts. Owners Corp.*, 70 AD3d 1019 [2d Dept 2010]). The Fourth Department, in *B.T.N. v Auburn Enlarged City School Dist.* (45 AD3d 1339 [2007]), affirmed denial of defendant's motion for summary judgment in a case alleging harm from exposure to atypical molds, stating:

> "The record contains sufficient epidemiological evidence to support a finding of general causation, i.e., that the atypical molds found to be present in the school building can cause plaintiffs' symptoms. In addition, the affidavit of plaintiffs' expert is sufficient to support a finding of causation. There is no requirement that an expert precisely quantify exposure levels or establish a dose-response relationship. Rather, an expert may use a methodology generally accepted in the scientific community in concluding that the particular exposure caused the plaintiffs' symptoms" (*id.* at 1340 [citations omitted]; *see also Martin v Chuck Hafner's Farmers' Mkt., Inc.*, 28 AD3d 1065 [4th Dept 2006] [the plaintiff's expert affidavit raised a triable issue of fact as to whether the plaintiff's exposure to aspergillus mold caused his injuries]).

Moreover, this Court, in *Daitch v Naman* (25 AD3d 458 [2006]), seemingly embraced the theory that exposure to mold can cause personal injuries. In denying cross motions for summary judgment, this Court stated, "The conflicting opinions of the parties' experts raise issues of fact as to . . . whether such mold caused plaintiffs' alleged injuries" (25 AD3d at 459).

It is undisputed that exposure to toxic molds is capable of causing the types of ailments from which plaintiff suffers. Plaintiff's expert, via differential diagnosis, arrived at the scientifically sound conclusion that exposure to the toxic molds in plaintiff's apartment was a cause, within a reasonable degree of medical certainty, of her documented medical ailments. The motion court reasoned that "*Fraser* rejected Dr. Johanning's claim to have established causation by means of 'differential diagnosis' " (2009 NY Slip Op 52707[U], *6). However, this Court has never rejected differential diagnosis as an unsound scien-

tific procedure. Rather, this Court has stated that in order to be considered as a possible cause, in a differential diagnosis matrix, a given agent must be capable of causing the harm observed. Thus, in *Marso v Novak* (42 AD3d 377 [2007], *lv denied* 12 NY3d 704 [2009]), we rejected an expert's opinion as to causation, arrived at through differential diagnosis, not because the differential diagnosis was an unreliable methodology, but because the medical literature did not support the premise that bradycardia was a risk factor for the type of stroke suffered by the plaintiff (*compare B.T.N. v Auburn Enlarged City School Dist.*, 45 AD3d 1339 [4th Dept 2007], *supra* [the plaintiff's expert opinion that the plaintiff's injuries were caused by toxic mold exposure, arrived at through differential diagnosis, met test of scientific reliability]).

Here, on the other hand, plaintiff's expert and defendants' expert agree that mold is capable of causing the ill-health effects experienced by plaintiff. Defendants' expert opined that "[m]olds can cause a wide spectrum of illnesses, including allergies, irritation, hypersensitivity pneumonitis and direct infection." Defendants' expert did not examine plaintiff in arriving at his conclusion that mold had not caused her ailments, concluding that "in the case of Ms. Cornell, molds caused no significant, objectively documented illness."

Defendants argue that they are not liable because plaintiff's symptoms arose in October 2003, when demolition commenced in the basement, one month after defendants had sold the building. However, the evidence supports the inference that the molds found in the basement were indicative of long-standing water damage occurring while defendants owned the building, and that the long-standing mold had migrated through the floorboards and the air shaft as a result of the demolition work in the basement.

Based on the foregoing, we modify the order appealed from and reinstate plaintiff's claims against defendant 360 W. 51st Street Corp. Plaintiff, however, failed to raise an issue of fact whether defendant Shotwell acted in his individual capacity rather than in his capacity as an officer and shareholder of 360 W. 51st Street Corp., and thus, the complaint was properly dismissed as against him (*see Joan Hansen & Co. v Everlast World's Boxing Headquarters Corp.*, 296 AD2d 103, 109 [2002]).

Accordingly, the order of the Supreme Court, New York County (Marcy S. Friedman, J.), entered January 13, 2010, which, inter alia, granted the motion of defendants 360 W. 51st

Street Corp. and Geoffrey Shotwell for summary judgment dismissing the complaint as against them, should be modified, on the law, to reinstate the complaint as against defendant 360 W. 51st Street Corp., and otherwise affirmed, without costs.

CATTERSON, J. (dissenting in part). In my opinion, the plaintiff's expert failed to establish the reliability of his theory under the *Frye* standard of review—namely that his theory is generally accepted in the scientific community. The majority is persuaded by the "significant" findings in the two studies relied on by the plaintiff's expert. However, the majority disregards *Frye*'s requirement that those "significant" findings must be "generally" accepted. There is nothing in the record nor does the majority address whether these studies that link mold with respiratory illness are "generally accepted in the relevant scientific community." Therefore, I must respectfully dissent.

The plaintiff in this case is the tenant of an apartment on the first floor of a building in Manhattan. Defendant 360 W. 51st Street Corp. owned the apartment building until September 5, 2003, when it was sold to 360 West 51st Street Realty, LLC. On the day that the new owner began removing debris from the basement in order to renovate, the plaintiff allegedly became ill from dust, dirt, mold and debris that was purportedly released into the air and infiltrated her apartment. The plaintiff brought this personal injury action against, inter alia, the defendant and an individual shareholder.*

On January 25, 2008, the defendant and shareholder moved for summary judgment. The motion court granted the motion and dismissed the plaintiff's complaint. For the reasons set forth below, I would affirm the motion court's order in its entirety.

Although the plaintiff alleges that from 1997 through 2004 the basement of the building was damp and musty, the record suggests that her alleged injuries coincided not with the presence of mold or damp conditions in the basement, but with the demolition work performed in October 2003, when the defendant no longer owned the building. Moreover, there is no evidence in the record as to the level of mold or toxic substances present in the plaintiff's apartment during the time that the defendant owned the building. Thus, the plaintiff fails to raise an inference that her alleged injuries were proximately caused by any breach of duty by the defendant.

---

* Plaintiff settled with the new owner, defendant 360 West 51st Street Realty, LLC.

In any event, the plaintiff's submissions do not establish that her theory of causation is generally accepted within the relevant scientific community. The *Frye* test, articulated in *Frye v United States* (293 F 1013 [DC Cir 1923]), requires that the reliability of a new test, process, or theory be "generally accepted" within the relevant scientific community. (*Marsh v Smyth*, 12 AD3d 307, 310-311 [1st Dept 2004, Saxe, J., concurring].) Reliability is typically established by considering whether other experts in the same field accept the reliability of the theory. (*Id.*, citing *People v Wesley*, 83 NY2d 417, 439 [1994, Kaye, J., concurring] ["(t)he *Frye* test emphasizes counting scientists' votes"] [internal quotations marks and citation omitted].)

The plaintiff put forward the affidavit of an expert who opined that the plaintiff's injuries were the result of exposure to "an unusual mixture of atypical microbial contaminants," including mold. The expert supported his conclusion through the use of his differential diagnosis of the plaintiff. In *Fraser v 301-52 Townhouse Corp.* (57 AD3d 416 [1st Dept 2008], *appeal dismissed* 12 NY3d 847 [2009]), this Court rejected this theory as not generally accepted in the scientific community.

The majority contends that the plaintiff's scientific evidence was sufficient to establish that "exposure to molds . . . can cause the types of ill effects experienced by plaintiff." Similarly, the majority finds that the plaintiff's evidence "easily satisfied the test of scientific reliability set forth in *Frye*."

While the plaintiff's expert may have sought to demonstrate that there was scientific evidence that mold caused the plaintiff's injuries, the expert failed to establish the essential requirement of *Frye*, general acceptance of the expert's theory within the relevant scientific community. Indeed, the first of the two post-*Fraser* studies, relied on by the plaintiff's expert and the majority, plainly states that, "[t]he data reviewed here represent *initial* steps toward defining the pathophysiological mechanisms for the aeroirritant effects of damp homes and associated excess mold growth" (emphasis added).

Similarly, the second post-*Fraser* study relied on by the plaintiff's expert for the exposure-response relationship was based on a study of a single office building in 2001-2002. The study contains no evidence that the conclusions were adopted by the National Institute for Occupational Safety and Health, the agency sponsoring the study; nor does the plaintiff make that claim.

These two studies fall short of establishing general acceptance in the scientific community that there is a causal connec-

tion between exposure to mold and the plaintiff's injuries. As such, I would not depart from our holding in *Fraser*.

ANDRIAS, J.P., SAXE and ABDUS-SALAAM, JJ., concur with MANZANET-DANIELS, J.; CATTERSON, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered January 13, 2010, modified, on the law, to reinstate the complaint as against defendant 360 W. 51st Street Corp., and otherwise affirmed, without costs.